USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/7/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

ERIC MYRIECKES,

                        Plaintiff,

        -against-

TERI WOODS; TERI WOODS PUBLISHING, LLC;
and CURTIS SMITH,

                    Defendants.

---------------------------------------X

08 Civ. 04297(GBD)(THK)

(PRO SE)

**Report and
Recommendation**

**TO: HON. GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff, proceeding pro se, brings this copyright infringement action pursuant to 17 U.S.C. §§ 106(1) and (3). He asserts both federal copyright claims and state common law claims for unfair competition. The case has been referred to this Court for general pretrial supervision and Reports and Recommendations on dispositive motions, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

Presently before the Court are (i) Plaintiff's motion for a default judgment against Defendants Teri Woods ("Woods") and Teri Woods Publishing, LLC ("TWP"); and (ii) Woods and TWP's motion to dismiss, which the Court has converted, in part, to a motion for summary judgment. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied, that Defendants' motion be granted, and that each of Plaintiff's claims therefore be dismissed with prejudice.

1

## I.   Background

Plaintiff contends that Defendants copied from a novel he wrote, titled <u>Street Games</u>, as the basis for a second work published by TWP titled <u>Deadly Reigns</u>.  Plaintiff alleges that, in early 2005, he sent an original manuscript of his book, then called "White Heat," to TWP to be considered for publication.  (<u>See</u> Amended Complaint, dated June 16, 2008 ("Am. Compl.") ¶ 15.)  After changing the title, Plaintiff obtained copyright ownership of <u>Street Games</u> in August of the same year.  <u>Street Games</u> was then published, distributed, and sold in the United States.  (<u>See id.</u> ¶¶ 16-18.)

<u>Deadly Reigns</u>, according to Plaintiff, is substantially copied from his "White Heat" manuscript.  (<u>See</u> Am. Compl. ¶ 27.) Plaintiff does not allege verbatim copying, but, rather, that <u>Deadly Reigns</u> makes use of protected story elements from <u>Street Games</u>.  According to Plaintiff, two other books published by TWP, <u>Deadly Reigns II</u> and <u>Deadly Reigns III: The Next Generation</u>, which continue the story begun in <u>Deadly Reigns</u>, also derive from those protected elements. (<u>See</u> Am. Compl. ¶¶ 6, 14.)

Woods and TWP apparently paid Curtis Smith, a former Defendant in this action, to play some role in drafting the <u>Deadly Reigns</u> series.  (<u>See</u> Defendant's Motion for Summary Judgment, dated July 25, 2008 ("Smith Mot.").)  Plaintiff's Amended Complaint asserted New York state law claims for unjust enrichment and unfair

2

competition against Smith.  However, as recommended by this Court's Report and Recommendation dated March 10, 2009, by Order dated March 31 the District Court dismissed each of Plaintiff's claims against Smith because they are preempted by section 301 of the Copyright Act.[1]

Plaintiff filed his Amended Complaint in June 2008.  Woods and TWP, believing they had not been properly served with process, did not appear in the case until November, when Plaintiff moved for a default judgment against them.  They opposed the entry of default, and cross-moved to dismiss the Amended Complaint.

The gravamen of Defendants' motion is that Plaintiff cannot show that <u>Deadly Reigns</u> and <u>Street Games</u> are "substantially similar" under the applicable legal standard for establishing copyright infringement.  (<u>See</u> Defs.' Mot. at 6-24.)  "[S]ubstantial

---

[1] Although the District Court dismissed Plaintiff's state law claims against Smith with prejudice, Plaintiff has since applied for leave to amend his Amended Complaint for the purpose of asserting copyright claims against Smith.  However, because such claims would depend on proving that <u>Street Games</u> and <u>Deadly Reigns</u> are substantially similar as a matter of copyright law, they could not succeed.  For the reasons explained below, no reasonable finder of fact could conclude that the two works are substantially similar.  Thus, amending the Amended Complaint would be futile.  <u>See Van Buskirk v. The New York Times Co.</u>, 325 F.3d 87, 92 (2d Cir. 2003) (affirming the dismissal of a complaint with prejudice where "further amendment . . . would be futile"); <u>Nwakocha v. Sadowski</u>, 369 F. Supp. 2d 362, 372 (E.D.N.Y. 2005) ("A court . . . has discretion to dismiss with prejudice if it believes that amendment would be futile or would unnecessarily expend judicial resources.").  Accordingly, there is no reason to disturb the dismissal of Plaintiff's claims against Smith with prejudice.

3

similarity," they assert, "is not present as a matter of law."
(Id. at 9.)  According to Woods and TWP, their motion "turns on the
Court's analysis of the similarity or lack thereof between the
parties' works," copies of which they provide as exhibits. (Id. at
9 & Ex. G.)

As noted in the Court's Order of January 13, 2009, Woods and
TWP's motion effectively contends that there can be no issue of
material fact that would allow a reasonable jury to conclude that
Deadly Reigns infringes Plaintiff's copyright in Street Games.
Thus, though styled as a motion to dismiss, in substance the motion
seeks summary judgment on Plaintiff's copyright claims.  See Fed.
R. Civ. P. 56(c) (requiring a party moving for summary judgment to
show "that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law");
Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir.
2002) ("A dispute regarding a material fact is genuine 'if the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party.'") (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).

For that reason, and because Woods and TWP's motion is based
on materials other than the pleadings themselves (the two novels in
question), the Court provided notice to Plaintiff that it would
treat the motion as a motion for summary judgment, pursuant to Rule
12(d) of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P.

4

12(d) (instructing that, where "matters outside the pleadings are presented to and not excluded by the court" on a motion to dismiss, "the motion must be treated as one for summary judgment under Rule 56," after giving parties a "reasonable opportunity to present all material that is pertinent to the motion"); Gusler v. Fischer, 580 F. Supp. 2d 309, 313-14 (S.D.N.Y. 2008) (converting a Rule 12(b)(6) motion to dismiss a copyright infringement action into a Rule 56 motion); Mallery v. NBC Universal, Inc., No. 07 Civ. 2250 (DLC), 2007 WL 4258196, at *2 (S.D.N.Y. Dec. 3, 2007) (converting a motion to dismiss into a motion for summary judgment to address the merits of the parties' arguments concerning "whether the alleged similarities relate to noncopyrightable elements and whether any reasonable observer could consider the works substantially similar").[2]   The January 13 Order invited Plaintiff to respond to Defendants' arguments about the absence of substantial similarity,

---

[2] The Amended Complaint discusses the contents of the two novels at length, as the basis for explaining Plaintiff's claim that Deadly Reigns infringes on Street Games. (See Am. Compl. ¶¶ 23-30.)  Consequently, the Court also could have addressed the question of whether the two books are substantially similar as a matter of law in deciding Defendants' 12(b)(6) motion by simply considering the novels as materials that are "reli[ed] on" by, "incorporated . . . by reference" into, and "integral to" the Amended Complaint.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).  However, in light of Plaintiff's pro se status, the Court elected to convert the motion to an application for summary judgment pursuant to Rule 12(d), and to allow the Plaintiff further opportunity to respond to Defendants' arguments about why no infringement occurred.

and to submit any additional materials upon which he wished to rely.    After granting Plaintiff several extensions of time, it received his supplemental submission on March 23, 2009.

## II.  Default Judgment Against Woods and TWP is Unwarranted

Plaintiff asserts entitlement to a default judgment against Woods and TWP because they failed to respond to the Amended Complaint within the twenty-day time period established by Rule 12(a).   He contends that he served process on Woods and TWP in August 2008, more than two months before they first appeared in the case by moving to dismiss, on November 4.   However, even assuming that both Woods and TWP were properly served in August as Plaintiff alleges, they have satisfied the standard for defeating a default judgment.   Plaintiff's motion should therefore be denied.

A.   Facts

As proof of service of process, Plaintiff offers the receipt for a summons and copy of the Amended Complaint served by the United States Marshals Service at the business address of Woods and TWP on August 22, 2008.   (See Process Receipt and Return, dated Aug. 22, 2008, attached as Exhibit ("Ex.") 2 to Affirmation of Eric Myrieckes, dated Oct. 21, 2008 ("Myrieckes Aff.").)    Tracy Braithwaite, Woods's assistant and an employee of TWP, signed for the summons.   (See id.; Defendants Opposition to Plaintiff's Motion for Default Judgment and Memorandum of Law in Support of Motion to Dismiss, dated Nov. 5, 2008 ("Defs.' Mem."), at 1; Affidavit of

Terry Woods in Opposition to Plaintiff's Motion for Default Judgment, dated Nov. 4, 2008 ("Woods Aff.") ¶ 2.)   Although Woods did receive copies of the summons and Amended Complaint that day, she believed they had arrived by mail.   (See Woods Aff. ¶ 2.)

Woods informed John Pelosi, Esq. ("Pelosi"), counsel for herself and TWP, about the lawsuit, and told him the that the summons had been mailed to her.   Pelosi wrote a letter to the District Court on September 2, copying Plaintiff.   (See Affidavit of John Pelosi, Esq., in Opposition to Motion for Default Judgment and in Support of Motion to Dismiss, dated Nov. 4, 2008 ("Pelosi Aff.") Ex. D.)   The letter claimed that Plaintiff's "attempts thus far to serve [Woods and TWP] have been insufficient."   (Pelosi Aff. Ex. D.)   Pelosi wrote a letter to Plaintiff on the same day, asserting that Plaintiff's attempts to serve Woods and TWP "have been insufficient and [Woods and TWP] do not consent to any waivers."   (Id. Ex. E.)[3]

In mid-September, Woods learned that the Amended Complaint had

---

[3] On September 17, 2008, the Marshals Service attempted to personally serve Woods at the business address for Woods and TWP, but returned the summons unexecuted.   (See Myrieckes Aff. Ex. 1.) Defendants argue that this shows Plaintiff's awareness of the failure of his first attempt at service by personal delivery in August.   (See Defs.' Mem. at 2.)   Plaintiff responds that he did not authorize the second attempt.   (See Reply to Defendants' Opposition to Default Judgment and Motion to Dismiss the Amended Complaint, dated Dec. 15, 2008 ("Pl.'s Reply"), at 6).   Neither the failure of the second attempt, nor the question of whether Plaintiff authorized it, is material to the Court's decision that Woods and TWP have demonstrated that default is unwarranted.

been personally delivered to Braithwaite, rather than sent in the
mail.   Nevertheless, Woods failed to immediately inform Pelosi.
Woods believed that Plaintiff was required to deliver the service
papers directly to her, and not merely a TWP employee, before
either she or TWP was obligated to respond.  (See Woods Aff. ¶ 5.)
Pelosi did not discover that Braithwaite had signed for the summons
until he received a copy of Plaintiff's motion for a default
judgment on October 28, 2008.  (See Pelosi Aff. ¶ 7.)

B.   Discussion

Although TWP does not dispute that it was properly served,[4]
Woods argues that Plaintiff has not satisfied the requirements for
effecting service on her under Rule 4 of the Federal Rules of Civil
Procedure.[5]   However, the Court need not resolve this issue.

---

[4] See, e.g., M'Baye v. World Boxing Ass'n, 429 F. Supp. 2d
652, 659-60 (S.D.N.Y. 2006) (approving service on a corporation
where a receptionist personally received service papers, and the
corporation had actual notice of the lawsuit).

[5] The only section of the Rule under which Plaintiff's
service of Woods was arguably effective is Rule 4(e)(1), which
permits service by any manner approved under the law of the
"state where the district court is located."  Fed. R. Civ. P.
4(e)(1).  Section 308(2) of the New York C.P.L.R. allows service
on an individual by "delivery to a person of suitable age and
discretion at the actual place of business" of the individual,
followed by sending copies of the summons and complaint by mail
to the individual's business address.  See N.Y. C.P.L.R. § 308(2)
(McKinney's 2001).  To be effective, "proof of such service shall
be filed . . . within twenty days of either such delivery or
mailing, whichever is effected later."  Id.  Here, it is not
clear whether personal delivery to Braithwaite sufficed as
service on Woods, in the absence of a separate affidavit filed
with the Court by Plaintiff affirming that a copy of the Amended
Complaint was also mailed to Woods's business address.  Defendant

Assuming, for purposes of argument, that Plaintiff properly served both Woods and TWP when he claims he did, he is nevertheless not entitled to a default judgment against either.[6]

"[T]he entry of a judgment by default [is a] drastic remed[y], and should be applied only in extreme circumstances." <u>Marfia v. T.C. Ziraat Bankasi, New York Branch</u>, 100 F.3d 243, 249 (2d Cir. 1996) (quoting <u>Independent Prods. Corp. v. Loew's Inc.</u>, 283 F.2d 730, 733 (2d Cir. 1960)). Thus, doubt about whether a default judgment is warranted "should be resolved in favor of the defaulting party." <u>Enron Oil Corp. v Diakuhara</u>, 10 F.3d 90, 96 (2d

_____

points out that Plaintiff never filed an affidavit of mailing after the Amended Complaint was delivered to Braithwaite. While Plaintiff is correct that he may rely on the United States Marshals for service of process, the applicable case law stands primarily for the proposition that <u>pro se in forma pauperis</u> plaintiffs should be protected from <u>sua sponte</u> dismissal based on technical service defects. <u>See, e.g.</u>, <u>Romandette v. Weetabix Co.</u>, 807 F.2d 309, 310 n.1 (2d Cir. 1986) (recognizing that "[a] party allowed to proceed <u>in forma pauperis</u> is entitled to service by the U.S. Marshal," and declining to dismiss the action where the Marshal failed to timely effect service). It is less clear that a court should overlook service defects as part of considering whether to grant a default judgment, although at least one court has done so. <u>See Moore v. Bekins Moving & Storage Co.</u>, 135 F.R.D. 60, 62-63 (S.D.N.Y. 1991) (granting default judgment against corporation where the Marshal served a "dispatcher" employed by the company, based on a "liberal[]" reading of Rule 4). In any event, as explained below, it is not necessary to resolve this issue here, as Defendants have satisfied the standard for defeating a motion for default judgment.

[6] Furthermore, Woods has indicated that if the Court finds service on her was ineffective, she nevertheless wishes to waive service so that she may join in Defendants' motion to dismiss the Amended Complaint.

Cir. 1993).

"[W]here a defendant opposes a plaintiff's motion for a default judgment (or moves to set aside a default judgment under Fed. R. Civ. P. 55(c)) the district court should consider three factors: 1) whether, and to what extent, the default was willful; 2) whether defendants have a meritorious defense; and 3) whether vacating the judgment would cause prejudice to the plaintiff." Credit Lyonnais Sec. (USA), Inc., v. Alcantara, 183 F.3d 151, 154 (2d Cir. 1999).

Finding that a default was willful "requires something more than mere negligence, such as egregious or deliberate conduct, although the degree of negligence in precipitating a default is a relevant factor to be considered." New York v. Green, 420 F.3d 99, 108 (2d Cir. 2005) (quotation marks and citation omitted).[7] In this case, Woods and TWP have established that their delay in responding to the Amended Complaint was, at most, negligent. One month after Braithwaite received the Amended Complaint, both Woods and her attorney believed service on Woods and TWP was insufficient, because the summons and Amended Complaint had arrived only by mail. (See Woods Aff; Pelosi Aff.) As documented in Pelosi's letters to the District Court and Plaintiff, Woods and TWP relied on the advice of counsel in believing they were not yet

---

[7] The same substantive legal standard applies to a motion to set aside a default judgment under Rule 60(b)(4), such as the one addressed in Green. See 420 F.3d at 108.

obligated to respond.  (<u>See</u> Pelosi Aff. Exs. D-E.)

Of course, when Woods first received the summons, it would have been prudent for her to clarify the manner of delivery.  Woods could have simply asked Braithwaite, her assistant, exactly how it had arrived.  Without question, once Braithwaite told Woods in September that a United States Marshal had personally delivered the documents, Woods should have informed Pelosi.  This would have allowed a timely determination that, at a minimum, TWP had been properly served.  Yet, Woods affirms on behalf of herself and TWP that she "take[s] this matter very seriously," and wishes to defend the case on the merits. (Woods Aff. ¶ 6.)  This provides sufficient evidence of good faith to preclude finding that the delay resulted from willfulness, and not merely poor judgment or inattentiveness to how quickly Woods and TWP would be required to appear in the lawsuit.  <u>See</u> <u>Westvaco Corp. v. Viva Magnetics Ltd.</u>, No. 00 Civ. 9399 (LTS)(KNF), 2002 WL 1683454, at *2 (S.D.N.Y. July 24, 2002) (denying plaintiff's motion for a default judgment where defendant "believed that service had not been properly effected," and was therefore not willful in failing to respond to the complaint).  The first factor for considering whether to enter a default judgment thus weighs against granting Plaintiff's request.

To prevail on the second factor, a defendant "need not conclusively establish" a meritorious defense.  <u>Davis v. Musler</u>, 713 F.2d 907, 916 (2d Cir. 1983).  The test "is measured not by

11

whether there is a likelihood that [a defense] will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense." Pecarsky v. Galaxiworld.com, Ltd., 249 F.3d 167, 173 (2d Cir. 2001) (quoting Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 98 (2d Cir. 1993)).  Woods and TWP have thoroughly briefed their arguments that Plaintiff cannot show copyright infringement as a matter of law, and that his state law claims are preempted.  If proven at trial, these contentions would establish a complete defense to each of Plaintiff's claims.[8]  Thus, the second factor also weighs against entering a default judgment. See Pecarsky, 249 F.3d at 174 (concluding that the defendant raised a meritorious defense because its arguments would preclude liability if proven); Holland v. James, No. 05 Civ. 5346 (KMW)(KNF), 2008 WL 3884354, at *4-5 (S.D.N.Y. Aug. 21, 2008) (finding that the defendants presented a meritorious defense because their argument gave a factfinder "some determination to make") (quotation marks and citation omitted).

As for the third factor, finding that a plaintiff will be prejudiced by the absence of a default judgment requires more than mere delay.  "For example, delay may thwart plaintiff's recovery or

---

[8] In fact, as explained below, Woods and TWP are entitled to summary judgment on Plaintiff's copyright claims, because no reasonable fact-finder could conclude that the two works in question are substantially similar.  In addition, the Copyright Act wholly preempts Plaintiff's New York common law claims for unfair competition.

remedy.  It also may result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." Green, 420 F.3d at 110 (quotation marks and citation omitted); accord Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983).

Plaintiff fails to identify any actual prejudice he will suffer if a default judgment is not entered.  He first decries the "tedious" need to proceed with discovery in the case if his motion is denied, and the consumption of his time and resources.  (See Pl.'s Reply ¶ 19.)  However, the lost convenience of winning a case without having to prove it is not prejudice.  The purpose of granting a default judgment is to provide a remedy when a party refuses to defend an action in good faith; it is not to create a windfall for plaintiffs with substantively deficient claims.  At best, the allegedly prejudicial results Plaintiff cites consist of "delay alone." See Green, 420 F.3d at 110.  Furthermore, even Defendants' delay in appearing in the case, which was approximately two and a half months, is relatively insubstantial.

Plaintiff also reiterates his claims for damages and injunctive relief.  He alleges that continuing sales of Deadly Reigns and derivative works are depleting the market for Street Games, and for any sequels he may wish to write.  The harm from such sales will persist, he asserts, if he cannot bypass discovery and proceed to the entry of an injunction against Woods and TWP

13

upon default.  (<u>See</u> Pl.'s Reply ¶¶ 20, 22-23.)  However, he does not claim that Woods and TWP are insolvent, or suggest any reason that he could not adduce sufficient proof to allow for the accurate estimation of damages in lost revenues and goodwill, were he to prevail at trial.  Thus, sales of allegedly infringing works during the delay caused by Woods and TWP cannot "thwart [any] recovery or remedy" to which Plaintiff would be entitled if he were to succeed on the merits.  <u>See</u> <u>Green</u>, 420 F.3d at 110; <u>Atlantic Recording Corp. v. Brennan</u>, 534 F. Supp. 2d 278, 282 (D. Conn. 2008) (denying a motion for default judgment on copyright infringement claims, and noting that the plaintiff's claims to injunctive relief based on allegations of infringement were insufficient to establish prejudice).

Since Plaintiff has "made no attempt to demonstrate that" the delay "negatively affected the evidence or [his] ability to conduct discovery in the case, or has enabled Defendants to engage in fraud or collusion," the Court finds he will not be prejudiced by denying his request for a default judgment. <u>Kee v. Hasty</u>, No. 01 Civ. 2123 (KMW)(DF), 2004 WL 807071, at *5 (S.D.N.Y. Apr. 14, 2004) (Report and Recommendation, recommending denial of a motion for default judgment, adopted on April 1, 2005.).

Because each of the three relevant factors weighs against granting Plaintiff's application for a default judgment, Plaintiff's motion should be denied.

14

### III. State Law Claims

Plaintiff asserts New York state law claims for unfair competition against Woods and TWP. (See Am. Compl. ¶¶ 37-48.) Defendants contend that these claims are preempted by the Copyright Act, and must therefore be dismissed. For the reasons fully explained in the Court's March 10 Report and Recommendation, Defendants are correct. (See Report and Recommendation, No. 08 Civ. 4297 (GBD)(THK), dated March 10, 2009 ("Smith R&R").) Plaintiff's claims are predicated on what is known as "reverse passing off," in which "the alleged infringer sells the plaintiff's products as its own." Integrative Nutrition, Inc. v. Academy of Healing Nutrition, 476 F. Supp. 2d 291, 297 (S.D.N.Y. 2007). Such claims are "in fact . . . disguised copyright infringement claim[s], and hence preempted." Id. (quotation marks and citation omitted); accord American Movie Classics Co. v. Turner Entm't Co., 922 F. Supp. 926, 934 (S.D.N.Y. 1996).

Therefore, Plaintiff's unfair competition claims should be dismissed with prejudice. See Atrium Group de Ediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc., 565 F. Supp. 2d 505, 510-11 (S.D.N.Y. 2008) (dismissing a preempted state claim with prejudice despite the plaintiff's request for leave to amend, and noting that "[p]laintiffs have not . . . suggested any way in which the misappropriation claim can be repleaded to avoid § 301 preemption").

## IV.  Copyright Claims

### A.  Legal Standard for Summary Judgment on Copyright Infringement Claims

Summary judgment is appropriate when there is no genuine issue of material fact to be tried, and the moving party is entitled, as a matter of law, to judgment in its favor.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98-99 (2d Cir. 2003).  The moving party bears the burden of demonstrating that its opponent cannot prevail as a matter of law.  See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  If "a reasonable jury could return a verdict for the nonmoving party," the motion must be denied.  Lucente, 310 F.3d at 254 (quoting Anderson, 477 U.S. at 248, 106 S. Ct. at 2510).

For a plaintiff to prevail on a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'n, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 11 S. Ct. 1282, 1296 (1991); see Williams v. Crighton, 84 F.3d 581, 587 (2d Cir. 1996) (citing Feist for the standard for proving copyright infringement); Crane v. Poetic Prods. Ltd., 593 F. Supp. 2d 585, 590 (S.D.N.Y. 2009) (same).  "In the absence of direct evidence, copying is proven by showing '(a) that the defendant had access to the copyrighted work and (b) the

16

substantial similarity of protectible material in the two works.'" Williams, 84 F.3d at 587 (quoting Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993)).   A showing of "substantial similarity" requires proving both "(i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more than de minimis.'"   Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir. 2003) (quoting Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137-38 (2d Cir. 1998)); see Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 74-75 (2d Cir. 1997) (explaining that the "degree of similarity" between two works must be "quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred").

      To apply the standard for substantial similarity — in other words, to determine if more than a negligible amount of protected material has been copied — courts "examine the similarities" between the works in question "in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." Williams, 84 F.3d at 588; accord Clonus Assocs. v. Dreamworks, LLC, 457 F. Supp. 2d 432, 439-440 (S.D.N.Y. 2006); see also Twin Peaks Prods., Inc. v. Publ'ns Intern., Ltd., 996 F.2d 1366, 1372 (2d Cir. 1993) (articulating the standard as whether two works display "global similarities in structure and sequence").   In so doing, a

17

court should adopt the perspective of an "ordinary lay observer." See Walker v. Time Life Films, Inc., 784 F.2d 44, 51 (2d Cir. 1986) (explaining that the "ordinary observer" test is a customary formulation); Williams, 84 F.3d at 588 (defining the issue to be decided as "whether, in the eyes of the average lay observer, the [defendant's] works are substantially similar to the protectible expression" in the plaintiff's works). Unsurprisingly, "numerous differences tend to undercut substantial similarity." Warner Bros., Inc. v. Am. Broad. Cos., 720 F.2d 231, 241 (2d Cir. 1983) (quotation marks and citation omitted).

"When . . . a work contains both protectible and unprotectible elements, [a court] must take care to inquire only whether "the protectible elements, standing alone, are substantially similar." Williams, 84 F.3d at 588 (quotation marks and citation omitted); see Tufenkian Import/Export Ventures, Inc., 338 F.3d at 131 ("[S]ubstantial similarity . . . must be to that which is protected in the plaintiff's work."). Of course, copyright law protects only the particular expression of ideas, and not the ideas themselves. See Ringgold, 126 F.3d at 75. "[A]ll fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots." Jones v. CBS, Inc., 733 F. Supp. 748, 753 (S.D.N.Y. 1990). For that reason, there must come "a point in [the] series of abstractions" implicit in the expressions of a particular work "where they are no longer

protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended." Williams, 84 F.3d at 588 (quoting Zechariah Chafee, Reflections on the Law of Copyright, 45 Colum. L. Rev. 503, 513 (1945)).

In addition, so-called scenes a faire, or "sequences of events that 'necessarily result from the choice of a setting or situation'" in a work of fiction, "do not enjoy copyright protection." Williams, 84 F.3d at 587-88 (quoting Walker, 784 F.2d at 51). "Similarly, there is no copyright protection for familiar 'stock figures' borrowed from the public domain." Littel v. Twentieth Century Fox Film Corp., No. 89 Civ. 8526 (DLC), 1995 WL 404939, at *4 (S.D.N.Y. July 7, 1995) (citing Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930)).

For present purposes, Woods and TWP concede that Plaintiff owns a valid copyright in Street Games, and that they had access to his manuscript for the story. (See Defs.' Mem. at 8.) Thus, they are entitled to summary judgment "either [if] the similarity" between Street Games and Deadly Reigns "concerns only noncopyrightable elements of [Plaintiff's] work, or [if] no reasonable trier of fact could find the works substantially similar." Walker, 784 F.2d at 48.

B.   Application to Plaintiff's Claims

After bracing itself for two "suspenseful, melodramatic

19

novel[s] with sex and excessive violence" (Am. Compl. ¶ 24.), the
Court read both Street Games and Deadly Reigns.  It now concludes
that no reasonable trier of fact could find that the two works are
substantially similar for purposes of copyright law.

Plaintiff's claim arises from the fact that, broadly, both
books tell stories about undercover agents falling in love with
drug dealers.  They share a number of narrative features that
follow from this premise, along with a handful of character and
setting details.  Of course, even assuming that Defendants actually
borrowed some of these ideas from the "White Heat" manuscript for
use in Deadly Reigns, copyright law did not forbid them from doing
so.  "As the Second Circuit has explained, there is a difference
between 'factual copying and actionable copying.'"

> The former (probative similarity) requires only the fact
> that the infringing work copies something from the
> copyrighted work; the latter (substantial similarity)
> requires that the copying is quantitatively and
> qualitatively sufficient to support the legal conclusion
> that infringement (actionable copying) has occurred.

Gottlieb Dev. LLC v. Paramount Pictures Corp., 590 F. Supp. 2d 625,
631 (S.D.N.Y. 2008) (quoting Ringgold, 126 F.3d at 75).

Here, the similarities between Street Games and Deadly Reigns
are neither quantitatively nor qualitatively sufficient to support
an infringement claim.  In fact, all of the parallels that
Plaintiff describes between the two books are either too abstract
to qualify as protected expression, see Jones, 733 F. Supp. at 753,
de minimis, see Tufenkian Import/Export Ventures, Inc., 338 F.3d at

131, or unprotected stock characters and <u>scenes a faire</u>, <u>see</u>
<u>Williams</u>, 84 F.3d at 587-88.

    1.  Plot and themes

Both <u>Street Games</u> and <u>Deadly Reigns</u> proceed from the premise
that the FBI assigns a female undercover agent to target a male
drug kingpin whose associates have murdered law enforcement
officers. Plaintiff asserts, fairly, that both are built on themes
of "the power struggle associated with being a leader in the drug
business," and "a beautiful [woman's] temptations as an undercover
federal agent" assigned to insinuate herself into the personal life
of a charismatic drug kingpin. (Am. Compl. ¶ 23.) At a general
level of abstraction, each presents two major storylines
corresponding to the elements Plaintiff identifies: one, a "major
drug distribution" operation and a "territorial drug war" (Am.
Compl. ¶ 25), and two, the development of a romantic relationship
between the drug dealer and the agent, and its consequences.

This broad plot structure, and the themes it encompasses, are
"not protected by copyright." <u>Littel</u>, 1995 WL 404939, at *14
(holding that "a suspenseful story involving a police lieutenant
and a brutal killer who is ultimately vanquished by the strength
and ingenuity of the lieutenant, to the dismay of another character
who was hoping to capture the killer for study" was a "stock theme"
and not protectible). They are no more complicated or unique than
many others to which courts have denied copyright protection. <u>See</u>

21

id.; see also Crane v. Poetic Prods., Ltd., 593 F. Supp. 2d 585,
595 (S.D.N.Y. 2009) ("To the extent that both works are about Pope
John Paul I's succession and death, such basic plot ideas are not
[protectible], even if they were not historical facts.") (internal
quotation marks omitted); Williams, 84 F.3d at 587-88 (listing
unprotected story features that "flow from the uncopyrightable
concept of a dinosaur zoo"); Alexander v. Haley, 460 F. Supp. 40,
45 (S.D.N.Y. 1978) (denying copyright claim and comparing two
"amalgams of fact and fiction derived from the sombre history of
black slavery in the United States," each of which "purport[ed] to
be at least loosely based on the lives of the author's own
forbears").

Furthermore, the plots of Street Games and Deadly Reigns
diverge before reaching any level of generalization sufficiently
specific to qualify as protected expression.    The "numerous
differences" between the two works in plot structure and themes
remove any doubt as to the futility of Plaintiff's claim to
substantial similarity.   See Warner Bros., 720 F.2d at 241.

The first major storyline in Street Games follows Lamont
"Limbo" Admams ("Limbo"), who heads a drug-dealing organization in
Johnstown, PA.  (See generally Street Games ("SG"), Ch. 17, 22-23,
41.)  Limbo brokers a deal between local Crip gang leaders to work
together to sell 300 kilograms of cocaine.   (See id. ch. 16-17.)
As the operation gets underway, Sadiq, an interloper from

Philadelphia, sends two men named Amir and Silk to Johnstown to encroach on Limbo's market.  (See id. ch. 23.)  Limbo rejects Amir and Silk's proposal that they rent a section of Limbo's territory (see id.), but the duo begins selling cocaine in Johnstown anyway (see id. at 218-20).  Subsequently, Limbo deploys an operative to murder Silk and his family at their home in Philadelphia.  (See id. at 221-27.)  With his posse, Limbo then storms into a cottage where Amir is having sex with a woman, and shoots him in the head after calling Sadiq on the telephone so that he can listen to the execution.  (See id. ch. 33.)

Sadiq retaliates by sending three men to ambush Murdock, Limbo's second in command, with a fusillade of gunfire on the street outside Murdock's girlfriend's apartment.  (See id. chs. 45, 47.)  Because he was wearing a special bulletproof vest stolen from the CIA, Murdock survives long enough for a tearful Limbo to watch him die in the hospital.  When Sadiq calls to claim credit for the shooting, Limbo vows to kill him — a task he presumably undertakes in a sequel to Street Games.  (See id. chs. 48, 49.)

The allegedly corresponding storyline in Deadly Reigns bears little resemblance to Plaintiff's work.  Deadly Reigns follows Damian Reigns ("Damian"), owner of a massive Texas-based corporate conglomerate that serves, in part, as a front for importing narcotics.  (See Deadly Reigns ("DR") ch. 2.)  His brother, Dante Reigns ("Dante"), handles security and enforcement.  The "power

23

struggle" has two major dimensions.  First, Damian plans to relinquish leadership of a "commission" of drug dealers from the southern United States, as well as suppliers from Central and South America, to focus on his legitimate businesses.  (<u>See</u> DR ch. 9.) The commission was designed to allocate the supply of drugs and keep the peace among regional kingpins.  Damian's announcement sparks a battle among the members who seek to replace him, because his withdrawal threatens to reduce revenue for everyone by closing off distribution channels.  (<u>See</u> <u>id.</u> chs. 6, 9.)

Second, Damian and Dante's estranged sister Princess, who is based in Florida, used to chair the commission.  However, she was ousted as the leader for waging territorial wars against the other members, including her brothers.  (<u>See</u> <u>id.</u> at 44-47.)  Princess proposes that she resume command after Damian withdraws, courting support from commission members by pledging to preserve his distribution chain.  (<u>See</u> <u>id.</u> chs. 6, 9.)  Damian and Dante oppose her, fearing renewed megalomaniacal excesses.  (<u>See</u> <u>id.</u> ch. 14.) While members abstain from violence at commission meetings, treachery prevails once they disperse; Princess attempts to slaughter anyone who stands in her way, including Damian and Dante.

The storyline then progresses through a series of attacks among Dante, Princess, and other commission members.  After Dante ferrets out and dispatches all of the commission members allied with Princess, she kills her own husband.  He was simply a target

24

for Dante, she explains, and therefore a liability.  (See <u>id.</u> ch. 34.) Princess then accepts control of Damian and Dante's drug operations in exchange for peace and a cut of the profits.  (See <u>id.</u> ch. 36.)

Plaintiff is correct that the second major storyline in both books commences with an undercover agent meeting her target in a nightclub.  However, the two narratives veer apart after that point.  Early in <u>Street Games</u>, FBI agent Jayme Johansen ("Johansen"), posing as a woman named Rhapsody, makes contact with Limbo at the nightclub where he and his cohorts are meeting.  She sends a bottle of champagne from the bar to Limbo's private room, but does not meet him in person that night. (See SG ch. 1.)  The two first speak many months later, when she begins visiting him in prison after he is convicted on relatively minor narcotics charges. Limbo's arrest caused his wife to leave him; upon his release, Johansen seduces Limbo, with the goal of collecting enough evidence to convict him of more serious crimes. (See <u>id.</u> ch. 6-7, 11, 15.) Limbo eagerly begins seeing Johansen romantically.  They engage in a series of explicit sexual encounters as he lavishes her with gifts, treats her to expensive meals, and whisks her off to the Carribean.   (See <u>id.</u> chs. 15, 20, 21.)   In spite of herself, Johansen falls in love with Limbo, which of course leads to psychic turmoil about the temptation to betray her mission. (See <u>id.</u> chs. 26, 31.)

Limbo also harbors doubts about Johansen.  While Limbo asks a private investigator named Spenser to check Johansen's background, she covers her tracks well enough that Spenser does not uncover her ploy until the end of the book, so Limbo has no inkling of her true identity.  (See id. chs. 9, 62.)  Nevertheless, racial tension and jealousy interfere with Limbo's ability to trust Johansen completely.  Limbo and his ex-wife Elixir are black, and some of his acquaintances, professing loyalty to Elixir, criticize him for dating Johansen, who is white.  (See id. at 142-43, 273.)  When Murdock adopts this attitude, the two friends have a falling out, which remains unresolved until the hospital scene noted above. (See id. at 276-79.)

Furthermore, when Johansen leaves town on another FBI assignment, her possessive ex-lover Keri lies to Limbo by telling him that Johansen is cheating on him.  In the most repellent and sadistic scene in either book, Limbo viciously rapes Johansen when she returns from the trip, to punish her suspected infidelity.  (See id. ch. 38.)  Yet, apparently guilty about deceiving the man she loves, she begs him to forgive her for upsetting him.  (See id. ch. 43.)  In the book's climax, Johansen appears in the phalanx of FBI agents whose gunfire has pinned Limbo down.  He curses her as he finally grasps that she was a government mole all along.  (See id. chs. 65, 66.)

In Deadly Reigns, the agent-kingpin romance storyline begins

26

when FBI agent Grace Moore, posing as a banker named Jonel McNeal, introduces herself to Damian Reigns at one of the nightclubs he owns.  (<u>See</u> DR ch. 3.)  Damian, who is not married, immediately asks Moore out, and begins dating her in the next chapter.  (<u>See</u> <u>id.</u> chs. 3-4.)  The storyline then unfolds along two dimensions that are absent from <u>Street Games</u>.  First, although both Moore and Damian are black, and there is no racial tension between the two, Dante is immediately suspicious of her, and the book follows his detective work as he picks apart her bogus background story.  His sleuthing succeeds in blowing her cover about halfway through the book.  He arranges for Moore and Damian to have dinner with him and a friend who graduated from the college that Moore claims to have attended as Jonel McNeal.  By questioning Moore about her supposed alma mater, Dante's friend establishes that Moore never set foot on campus, and discreetly conveys her conclusion to Dante.  (<u>See</u> DR chs. 6-7.)  Dante then tracks down the mother of the actual Jonel McNeal's college roommate.  She confirms that Dante's photo of Moore does not depict McNeal.  (<u>See</u> <u>id.</u> at 117-122.)  Subsequently, Dante lets Grace know that he is watching her, and threatens to kill her if she ever betrays Damian.  When Moore leads the FBI in a raid on one of Damian's properties, at the end of the book, Dante shoots her twice.  (<u>See</u> <u>id.</u> ch. 39, 42.)

Second, when Dante enlightens Damian about Moore's phony credentials, the two deduce that she works for the FBI, and Damian

hatches a plan to "turn her" to work in his favor. (<u>See</u> <u>id.</u> at 162.)  He explains to Dante, "I'm going to get her to fall in love with me," and then "she's going to defend me against [the FBI]. She'll go back to them and swear up and down that we're squeaky clean."  (<u>Id.</u>)  Through charm and guile, Damian attempts to delude Moore into believing that he has been unfairly made a scapegoat by the FBI.  As Plaintiff alleges, part of this campaign includes "wining and dining" her. (<u>see</u> Am. Compl. ¶ 27.).  He woos her with luxurious gifts, meals, and a Caribbean vacation — although, unlike Limbo and Johansen, Moore and Damian do not become sexually intimate until they have seen each other many times.  (<u>See</u> <u>id.</u> chs. 7-8, 16, 18, 20-21, 24.)  Furthermore, the cornerstone of his strategy is the conceit that he has been unjustly branded a criminal because he is a black man with power and influence.  He accuses government agencies of conspiring to destroy him, because his charitable work in education and counseling at-risk youth are "messing up the western Texas plantation system."  (<u>See</u> <u>id.</u> at 116.)

Consequently, although Moore's supervisors have briefed her on Damian's extensive criminal enterprise, for much of the book she grapples with whether there is any evidence of actual unlawful activity.  (<u>See</u> <u>id.</u> chs. 2, 11, 13, 15.)  After guiltily orchestrating several botched raids on Damian's warehouses, which yield no contraband, Grace admits to Damian that she has been

working for the FBI, but wants to give up her career to be with
him.  He tells her that he forgives her, and they decide to get
married.  (<u>See</u> <u>id.</u> ch. 38.)  Grace only accepts the truth towards
the end of the story, when she discovers cocaine hidden in one of
Damian's industrial complexes.  (<u>See</u> <u>id.</u> ch. 41.)

In sum, "at the most general level," the two novels in
question "tell the same story" of an undercover agent falling in
love with a drug kingpin.  <u>Walker</u>, 784 F.2d at 49.  Yet, "in moving
to the next level of specificity, differences in plot and structure
far outweigh this general likeness," and preclude any possibility
of substantial similarity.  <u>Id.</u>; <u>see</u> <u>Warner Bros.</u>, 720 F.2d at 241
(explaining that "numerous differences" between two works impair a
claim to substantial similarity).

Specifically, the international scope of the "territorial drug
war" storyline in <u>Deadly Reigns</u>, as well as the involvement of
numerous members vying to seize control, contrasts with the
bilateral dispute in <u>Street Games</u> between drug dealers in two
cities in Pennsylvania.  Defendants' novel at least aspires to
strike a Machiavellian note, in that the power struggle is enacted
not only through bloodletting, but through the characters' cunning
and craft at commission meetings.  Princess's strategy depends on
petitioning the other members for support while concealing her true
alliances, and striking swiftly against her enemies.  (<u>See</u> SG chs.
9, 14, 33.)  In <u>Street Games</u>, Limbo does not deign to negotiate

29

with the Philadelphia carpetbaggers, even as subterfuge, or attempt to persuade them to do anything but go home.   His face-to-face interactions with them consist solely of intimidation, thuggery and assault.   (See SG chs. 23, 33.)

Nothing in Street Games approximates the other engine of the power struggle storyline in Deadly Reigns: sibling rivalry between Princess and Dante.   Street Games explores no intra-family conflict, and lacks any analogue for Princess and Dante's relationship.   Each struggles in vain to have subordinates assassinate the other.  When speaking in person, however, they both prefer to quip sardonically.[9]

Finally, as of the end of Deadly Reigns, the power struggle storyline has culminated in a truce, while in Street Games it leaves off with Limbo's promise to avenge Murdock.

Differences also overwhelm any general likeness between the agent-kingpin romance storylines in the two works.   Deadly Reigns generates suspense from (i) the cat-and-mouse game between Dante and Moore, and (ii) Damian's upstanding-citizen act for Moore as

---

[9] After Dante escapes from an explosive device Princess planted in his car, he shows up at her house.  "I received your little present today, sis.  Are we attacking each other in our homes now?" (Id. at 46.)  Later, following an attack in which Princess's goons snuff two of Dante's bodyguards, he visits her again.  When she produces a bottle of champagne, he asks, "Are we celebrating my funeral or yours?," and she laughs.   (Id. at 274-75.)   After explaining that she has preemptively murdered her own husband to avoid any vulnerability that his capture or death might otherwise allow, she asks Dante, "What, did you think that I would give you the pleasure?" (Id. at 275.)

she attempts to puzzle out his true nature.  In <u>Street Games</u>, Limbo
is not in a position to deceive Johansen, and she quickly casts
aside her professional code to protect the homicidal thug with whom
she is smitten.  Thus, instead of having the characters stalk one
another, <u>Street Games</u> creates momentum by foregrounding sexual
episodes between Limbo and Johansen, interspersed with conflict
between Limbo and those who urge him not to trust her, as well as
his uneasy ruminations about her.  (<u>See</u> SG chs. 37-38, 55.)

Furthermore, the finer plot mechanics of the two works belie
Plaintiff's characterization of the parallels between the Damian-
Moore storyline and the Limbo-Johansen storyline.  Plaintiff
stresses that both Limbo and Damian ask their "head[s] of security"
to investigate Johansen and Moore, respectively.  (<u>See</u> Plaintiff's
Supplemental Submission Addressing Substantial Similarities, dated
Mar. 23, 2009 ("Pl.'s Supp.") ¶ 5.)  Yet, Murdock does not learn
anything incriminating about Johansen, and merely expresses vague
mistrust of her because she is white.  Dante, on the other hand,
pointedly questions Moore's cover story, and proceeds to debunk it.
Similarly, Plaintiff contends that, in both books, "the protagonist
has someone investigate [the agent's] identity and college
background and will eventually learn that she is not who she claims
to be."  (<u>see</u> Am. Compl. ¶ 27).  However, in <u>Deadly Reigns</u>, the
investigation is a major component of the plot, conducted by the
kingpin's second in command.    In <u>Street Games</u>, it is an

31

afterthought, which the reader only learns about secondhand through a peripheral character.  (See SG ch. 62.)  Moreover, the fact that Dante's investigation is fruitful, whereas Spenser's does not pay off until the end of the book, launches the plot of Deadly Reigns into territory that Street Games does not explore.  Limbo remains in the dark about Johansen.  Damian, on the other hand, leverages his intelligence about Moore to sabotage the FBI's surveillance of him.

For this reason, any cosmetic similarity to the "wining and dining" in Street Games and Deadly Reigns masks a fundamental distinction.  Damian is in control as he romances Moore, whereas Limbo, unaware that Johansen was sent to put him in jail, is more or less at her mercy, notwithstanding her submissive role in their romance.  Damian never feels threatened or jealous, unlike Limbo.  In fact, he succeeds in manipulating Moore into believing his vast narcotics empire is a myth.  (See DR ch. 37.)

It is true that, as Plaintiff alleges, both Johansen and Moore agonize about the untenable division of loyalty created by falling in love with their respective targets.  They clash with their superiors and other FBI agents over whether they can handle the pressure.[10]  (See DR ch. 29; SG ch. 26, 31.)  Unfortunately for

_____

[10] Plaintiff purports to identify a piece of dialogue from Street Games duplicated verbatim in Deadly Reigns: "During their dialogue, [Holmes] asks [Moore] 'Who is going to marry Damian, her [sic] or the person she is pretending to be?'. . . .  During their dialogue, Keri asks [Johansen] 'Who is going to be with

32

Plaintiff, Moore and Johansen's dilemma is merely a variation on one of the "stock themes" of "police fiction:" the "morale problems of policemen." Walker, 784 F.2d at 50. Furthermore, in Deadly Reigns, it is the pretense that Damian has been unfairly accused that relaxes Moore's emotional defenses. Johansen never has any doubt that Limbo is, in fact, a criminal, yet chooses to be with him anyway.

The Court also notes that Street Games includes several plot threads for which Plaintiff does not identify any match in Deadly Reigns. Street Games follows Johansen as she temporarily shelves Limbo's case to conduct a separate FBI undercover operation in West Virginia. (See SG chs. 35, 38.) The book also explores the psychopathology of Johansen's partner and ex-lover, Keri, who has been diagnosed as a "psychotic, psychosexual cannibal." (See id. at 285; chs. 38, 52.) Her obsession with Johansen drives her to interfere with Johansen's life and intimacy with Limbo. She builds a shrine to Johansen (see id. ch. 52), and in one scene, engages both Johansen and Limbo in sex (see id. ch. 28). In contrast, Moore's supervisor at the FBI, Elizabeth Holmes, is sane, and her relationship with Moore is purely professional. (See id. chs. 12,

---

Limbo, her [sic] or the person she is pretending to be?'" (Pl.'s Supp. ¶ 8.) He does not cite a page or chapter where the line appears in Street Games, and the Court is unable to locate it. However, even assuming that the line did, in fact, exist in Plaintiff's book, its appropriation could only amount to de minimis copying, and thus would not support a Copyright Act violation.

26.)

In light of the differences detailed above, "any resemblance between the plots" of Street Games and Deadly Reigns "at [the] level" Plaintiff describes "is limited to uncopyrigh[table] general concepts." Flaherty v. Filardi, No. 03 Civ. 2167 (LTS)(HBP), 2009 WL 749570, at *6 (S.D.N.Y. Mar. 20, 2009) (discussing two works allegedly sharing a plot structure of "a protagonist loser in love casually looking for a social substitute from an on-line source who ends up becoming increasingly involved in the legal plight of the prisoner and who goes through a series of emotional experiences affecting the [protagonist's] . . . life after corresponding with the prisoner") (quotation marks and citation omitted).

2.    Overall Concept and Feel

Woods and TWP characterize the dissimilarities in total concept and feel between the two works as follows:

> [Deadly Reigns] is a tale of a sophisticated, well-educated family that enjoys a fast-paced, ostentatious life as a result of its enormous fortune. Its "feel" is the mobster lore of rarified power and invincibility, where cunning criminals are able to use wealth, influence, and violence to compromise law enforcement and the judicial system, leaving them exempt from punishment. On the other hand, [Street Games] is a grittier tale of the realities of drugs and the streets. [The "feel" of Street Games] is more of the dark rise and fall of a street gangster.

(Defs.' Mem. at 24.)    This is a fair summary.    For all its excesses, Street Games cultivates a lurid aesthetic of gritty urban realism.    True, much of the "realism" is expressed in caricature.

34

Plaintiff's novel replicates the hackneyed inner-city gang saga mise-en-scene of nihilistic thugs, crack fiends whose humiliation and self-abasement know no limits, drug-infested housing projects, and racist cops. Yet, ultimately, as in many such sagas, the street level narcotics trade serves as a dark reflection of the American dream, where socioeconomically disadvantaged characters like Limbo risk going to jail and getting shot in pursuit of money and fame.

While this type of urban melodrama is familiar from movies such as New Jack City, Menace II Society, and Get Rich or Die Tryin', the setting for Deadly Reigns indulges a layer of fantasy more akin to that of a James Bond movie, or Miami Vice. The book's central characters traffic in narcotics, but control international shipments in massive quantities, far removed from the street-level deals in Street Games. (See SG ch. 2.) Furthermore, their education, influence, privilege, and unimaginable wealth grant each of them the irreproachable pedigree of the ultra-elite. Their unlimited means (and supposedly "refined" tastes) afford access to the world's most extravagant luxuries. While both novels wallow in materialism — Limbo does prosper, and spends immoderately — Street Games does not aspire to the same stratospheric level of affluence glorified in Deadly Reigns. See Littel, 1995 WL 404939, at *17 (finding a lack of substantial similarity where "plaintiffs' work emphasiz[es] the darker side of urban life, including scenes in

35

subway tunnels and abandoned buildings," and that "[d]efendants'
motion picture, though equally violent, has a glitzy feel enhanced
by shots of the jungle surrounding Los Angeles, the glass
buildings, and the bright light of the city"); <u>Kretschmer v. Warner
Bros.</u>, No. 93 Civ. 1730 (CSH), 1994 WL 259814, at *9 (S.D.N.Y. June
8, 1994) (contrasting the "foreboding, portentous" mood of one work
with the "softer" and "lightened" mood of another).

Plaintiff stresses that both works contain "excessive
violence" and "shootouts," terms that, of course, are far too
capacious to describe anything that might be protected by
copyright. (<u>See</u> Am. Compl. ¶ 24.) However, even the violence in
<u>Deadly Reigns</u> has a different feel than in <u>Street Games</u>. In
contrast to the gangland-style homicides in <u>Street Games</u>, such as
when Murdock is ambushed outside his girlfriend's apartment, or
when Limbo's subordinates beat, urinate on, and then shoot an
addict who approaches them outside a housing project (<u>see</u> SG ch.
12), the staging for the violence in <u>Deadly Reigns</u> is more
grandiose. The action scenes in the latter include two machine gun
attacks from helicopters, one circling a high-rise construction
project that Dante visits (<u>see</u> DR ch. 10), and the other hovering
near a commission member sitting in a ski lift (<u>see</u> <u>id.</u> ch. 19), as
well as a jet-ski chase and shootout (<u>see</u> <u>id.</u> ch. 25). Also,
unlike anyone in <u>Street Games</u>, Dante uses animals, including a
poisonous snake (<u>see</u> <u>id.</u> ch. 21), and tigers (<u>see</u> <u>id.</u> ch. 23), to

torture and kill his victims.

In terms of style, the gap between the two works is even broader. Leaving aside the fact that <u>Deadly Reigns</u> is much more coherent, lucid, and evenly paced than <u>Street Games</u>, the texture of the prose in <u>Deadly Reigns</u> is utterly different from Plaintiff's writing. The often unprintably profane, slang-heavy dialogue that pervades <u>Street Games</u>, establishes an inner-city gangster milieu:

> "What you trying to get, youngster?"
> "Half ounce." Ghetto sized him up. He would have bet his bank roll that he could take this chump.
> "What you know about hustling?"
> "What you know about minding your business, if you ain't got what I'm looking for?" . . . .
> "I'm gonna [f*ck] with you, youngster." Amir turned the scale around so Ghetto could read the weight. "'Cause I like your flow and we both dislike Limbo."
> "Yeah, that [n*ggah] foul. If I had my own army, I'd bust his head and take over his [sh*t]."

(SG at 218-19; <u>see, e.g.</u>, 73-76, 120-23, 144-49, 243-47, 276, 301-03.) Although certainly not without profanity, the dialogue in <u>Deadly Reigns</u> is icier and more genteel. Even when threatening one another, the characters display a measure of wry subtlety.

> "I think that you are mad my friend," Don Alemendez spoke to him. "You are in no position to decide life and death."
> "Whenever the commission meets, its members' safety is supposedly guaranteed," Dante reminded them. "I suppose that is no longer valid?"
> "You are no longer a member of the commission. From this moment on, your sister is. You my friend are shark food," Don Ferdinand said to him." (113.)

(DR at 113; <u>see, e.g.</u>, 68-72, 134-35.) In addition, Moore and Damian engage in a polite, flirtatious repartee on their early

37

dates, and speak French (see id. chs. 4, 7); Limbo and Johansen's early flirtations are more suggestive (see SG at 55), and then become sexually explicit (see id. at 107-08).

Deadly Reigns also employs extensive place descriptions to convey mood and setting.  For example, it devotes careful attention to portraying the pastoral countryside of Damian's estate where his grandmother is buried (see id. ch. 16), the lush Louisiana residence of commission member Renee Tibbideaux (see id. ch. 17), a volcano in Jamaica (see id. ch. 22), and the glitzy Palm Beach neighborhood where commission member Don Alemendez lives (see id. ch. 28).  Street Games does not attempt anything similar, again relying more on dialogue to create its atmosphere.  See Crane, 593 F. Supp. 2d at 595 (identifying "distinct style and wording" in conveying similar content as inconsistent with substantial similarity) (quotation marks and citation omitted).

Street Games utilizes a greater variety of narrative devices than Deadly Reigns.  Multiple narrators with distinct styles, including Limbo, Johansen, Keri, and a third-person omniscient voice, tell the story in Street Games.  (See, e.g., SG chs. 27-29.) The time sequencing in the novel loops through extensive flashbacks.  (See SG chs. 57-58.)  In fact, the time and setting frequently shift, without warning, in the midst of a single passage, and may do so several times in some chapters. (See id. at 218, 317; chs. 19, 35, 38.)  In contrast, Deadly Reigns is told

38

entirely by a third-person omniscient narrator, and its time progression is completely linear.   See Hogan v. D.C. Comics, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (finding a lack of harmony in total concept and feel where the defendant's work was "much more linear" than the plaintiff's).

Finally, Street Games is replete with pornography. (See SG chs. 1, 8, 15, 17, 19, 20, 21, 22, 28, 33, 38, 55.)   It contains lengthy, detailed, and vivid depictions of vaginal, oral and anal intercourse, as well as one brutal rape scene.   While there are three sexual sequences in Deadly Reigns (see DR chs. 25, 31, 35), none of them approaches the graphic prurience of Plaintiff's work.

In sum, given the contrast in atmosphere, prose style, mood, time sequence, and treatment of sexuality, the overall concept and feel of the works cannot reasonably be considered substantially similar.

     3.   Setting

The geographic setting for the majority of the action in Street Games is a small city in the northeastern United States.   In Deadly Reigns, it is Texas.   More palpable distinctions between the characters' immediate surroundings in the two works mirror the differences in total concept and feel described above.   Street Games takes place largely amidst the gang-controlled, inner-city drug trade at housing projects and crack houses.   Deadly Reigns plays out primarily in the highest echelon of moneyed enclaves

throughout the southern United States, and in their residents'
yachts and luxury automobiles.

Plaintiff identifies a scattering of locations for particular
scenes in Street Games that he claims Deadly Reigns replicates.
(See Am. Compl. ¶ 28.)  Four of these — a nightclub, a warehouse,
a Caribbean island, and a beach — fall into the category of "stock
settings" for gangster stories, and are thus not protected by
copyright.   See Scott-Blanton v. Universal City Studios Prods.
LLLP, 539 F. Supp. 2d 191, 201 (D.D.C. 2008) ("Indeed, the public
domain would have scant selection if stock settings such as the
movie theatre, the kitchen, Las Vegas, a church picnic or a club
were subject to copyright protection.") The two novels also make
different uses of each of these locations.  Deadly Reigns contains
only one brief nightclub scene.  In it, Damian shoos a drunken boor
away from Moore, and the two have a flirtatious conversation and
arrange a date.  (See DR ch. 3.)  While Limbo sees Johansen in a
nightclub early in Street Games, he does not speak to her or begin
dating her until much later.  Furthermore, throughout the book, the
club continues to serve as a backdrop in which Limbo and his crew
relax, scheme, and confront snitches and interlopers.  (See SG chs.
1, 19, 22, 25, 28, 39, 62.)

Only one warehouse appears in Street Games, on Johansen's
sojourn to West Virginia for a sting assignment that is completely
unrelated to Limbo.  (See id. ch. 54.)  Deadly Reigns features

multiple FBI raids in Damian's warehouses, as well as conversations in which Moore attempts to glean information from Damian while veiling her motivation, and Damian responds with misdirection. (See DR chs. 1, 13, 20, 27, 42.)  As for the Caribbean island and the beach, Limbo and Johansen jet down to Paradise Island in the Bahamas for one day.  They visit the beach long enough for Limbo to ogle other women and explain that he enjoys setting aside the constant vigilance necessary to survive in Johnstown.  After dinner that night, they return to the beach to have sex before boarding their flight home.  (See SG ch. 21.)  Damian and Moore take a longer vacation in Jamaica, where they hang glide, snorkel, swim, and ultimately make love for the first time on the beach.  (See DR chs. 21, 22, 23, 24.)

The one arguably less generic locale shared by the two works is a hot-air balloon.  However, as with the other allegedly pilfered settings, the particular treatment of the balloon in Street Games does not match that in Deadly Reigns.  In the former, it serves as an artful way for Limbo to transport drugs into Johnstown after one of his couriers has committed suicide, and provides an excuse for one of the book's pornographic dalliances. (See SG chs. 19, 28.)  In the latter, Damian and Moore take a romantic ride over Jamaica's beaches.  While they embrace and Moore becomes aroused, they do not get sexually intimate.

Thus, in addition to the fact that four of the allegedly

41

misappropriated settings are too generic to receive copyright protection, the particular use of all five locations differs between the two novels in terms of frequency and duration, as well as the nature of the characters' interactions that take place there.  None furthers Plaintiff's claim to substantial similarity. See Scott-Blanton, 539 F. Supp. 2d at 201; Robinson v. Viacom Int'l, Inc., No. 93 Civ. 2539 (RPP), 1995 WL 417076 (S.D.N.Y. July 12, 1995) (rejecting an argument that the settings in two works evidenced substantial similarity, because "the type and arrangement of furniture in the living rooms of the two families and the appliances in the kitchen are not ideas original with plaintiffs"); see also Williams, 84 F.3d at 589 (finding no substantial similarity between works that shared the setting of a dinosaur zoo).

> 4.   Characters

Plaintiff contends that Damian and Moore are modeled on Limbo and Johansen, respectively.  (See Am. Compl. ¶¶ 25-26.)  Yet, the central characters in Street Games share little more than a particular livelihood with their alleged counterparts in Deadly Reigns.  Both Limbo and Damian deal drugs.  However, while Limbo has thrived as a criminal and gained notoriety in local circles, he does not enjoy the privilege or social standing that Damian does. Whereas Limbo did not graduate from high school, Damian's ivy-league education, ostensibly lawful business empire, and political

42

connections make him a prominent figure in elite society. (See DR chs. 4, 7-8; SG chs. 19, 22, 28.)

Although Plaintiff alleges that both Limbo and Damian attempt to "avoid" a territorial drug dispute (see Am. Compl. ¶ 25), this does not accurately describe either individual. As an initial matter, neither Limbo nor Damian hesitates to have rivals murdered. Furthermore, Limbo's only effort to "avoid" any dispute involves his fall from grace as Johnstown's preeminent drug dealer. After Murdock is killed, Limbo arranges to personally bring a shipment of cocaine into Johnstown from Pittsburgh. (See SG chs. 52, 61.) His trip to collect the drugs affords several opportunities to reflect on his life in "the game" — i.e., drug dealing. When visiting his mother, Limbo recalls that he originally turned to selling drugs to alleviate his family's poverty. (See id. chs. 57-59.) Limbo's supplier, Twenty-One, urges Limbo to ponder why "the game" has separated him from his wife and children, and diminished his status to that of a "mule" ferrying shipments between cities. (See id. ch. 61.) After the climactic shootout with the FBI, which leaves him wounded and certain to be apprehended, he ruefully recalls Twenty-One's advice. (See id. at 412-14.)

Damian, on the other hand, does seek to distance himself from his criminal activities. He cedes control of the family's drug trafficking operations to Princess so that he can devote his attention to its lawful concerns — although not without retaining

43

a cut of the profits from the former.  (See DR ch. 36.)

Plaintiff also claims that both characters "believe[] in giving back to the community."  (See Am. Compl. ¶ 25.)  Limbo explains that when he realized the residents of a local housing project viewed him as a "drug dealing menace," he decided to "paint[] another picture to manipulate their judgment." (See SG at 270.)  He therefore began doling out turkeys on Thanksgiving, gift certificates at Christmas, money for uniforms for local little league teams, and other gifts and services.  As he hoped, his largesse quieted the community's criticism, and allowed his drug operation to flourish without interference.  (See id. at 270-71.)

Damian, too, buys sports uniforms for children, but he never admits to simply bribing the community to ignore his illicit undertakings.  Although charity certainly enhances the cloak of legitimacy covering Damian's drug empire, his greater enthusiasm distinguishes him from Limbo.  He appears to take a genuine interest in spending time with the beneficiaries of his philanthropy, which extends much more broadly than Limbo's to a variety of educational and community centers.  (See DR chs. 11, 18.)  Furthermore, Damian's passionate defense of the merits of his anti-prison programs, though delivered as part of his dissembling performance for Moore, nevertheless suggests that he truly cares about their mission.  (See id. at 116.)

Finally, Plaintiff's argument that both Limbo and Damian are

44

"unselfish" and "unafraid of commitment" is laughable.  When Limbo
worries that Johansen is unfaithful, he rapes her and then has sex
with another woman.  (See SG chs. 38, 39.)  As for Damian, while he
does not sleep with anyone but Moore during the course of Deadly
Reigns, his "commitment" to her serves a purely selfish objective
of a different quality than anything Limbo dreams up: misleading
the FBI.

Johansen and Moore are both undercover FBI agents, but share
no character traits apart from gender-based cliches.  Both are
ambitious, but because they both long for romantic commitment, they
become vulnerable to the advances of a criminal.  Yet, whereas
Moore comes from a relatively privileged family, is well-educated,
and is considered a brilliant and promising investigator among
fellow agents (see DR ch. 2), all readers learn about Johansen's
success in the FBI is that she uses her sex appeal to manipulate
men, and can skillfully wield a handgun.  (See SG chs. 7, 10.)
Moore is black, but Johansen is white, a fact that, as discussed
above, allows Street Games to express the threat she poses to Limbo
through racial tension.   Johansen is bisexual but Moore is
straight.  While Plaintiff identifies "willful ignorance" as common
to the two characters, this description can only plausibly apply to
Moore. (See Am. Compl. ¶ 23.)  Perhaps naively, Moore credits the
fiction that Damian's work is entirely lawful for much of the book,
and becomes furious when she finally learns the truth.     In

contrast, Johansen never has any illusions that Limbo might be innocent, and even conceals evidence of his wrongdoing.  (See SG Chs. 31, 34.)

Viewing all these facts from the perspective of the average lay observer, "the differences between" Limbo and Damian, and those between Johansen and Moore, "far outweigh the similarities." Arapia v. Anheuser-Busch Cos., 55 F. Supp. 2d 151, 161 (W.D.N.Y. 1999) (finding no substantial similarity between the plaintiff's character, a frog that croaked "bud bud," and defendants' characters, frogs that croaked parts of the name "Budweiser"). "[N]one of the similarities between these characters" — to wit, Damian and Limbo's drug dealing, violence, and charity, as well as the emotional turmoil arising from Johansen and Moore's attraction to their respective targets — "can be seen as anything other than generalized concepts," or the typical qualities of "stock characters."  Littel, 1995 WL 404939, at *16-17 (comparing two characters who are both "tough police lieutenants prone to violence," "suspended for misbehavior," and "have . . . sympathetic superior officer[s]," but who are suspended for different reasons, and only one of whom has a significant personal life that unravels as a result).

5.   Additional Allegedly Copied Story Elements

Plaintiff points to several additional story elements common to both Street Games and Deadly Reigns, including "the ordered

46

murders of law enforcement officers," "explosion[s] to destroy drug evidence" (see Am. Compl. ¶ 24), and FBI agents smoking Cuban cigars (see Pl.'s Supp. ¶ 1). These are scenes a faire that follow logically from the premise of a violent story in which the FBI pursues gangsters, just as "drunks, prostitutes, vermin and derelict cars" naturally appear in police stories about the South Bronx, Walker, 784 F.2d at 50, and "[a]ttempted escapes, flights through the woods pursued by baying dogs, the sorrowful or happy singing of slaves, the atrocity of the buying and selling of human beings, and other miseries" are "standard" in slave narratives, Alexander, 460 F. Supp. at 45; see Williams, 84 F.3d at 587 ("Electrified fences, automated tours, dinosaur nurseries, and uniformed workers . . . flow from the uncopyrightable concept of a dinosaur zoo . . . ."); Flaherty, 2009 WL 749570, at *18 (deeming "undercover activity by the lawyer protagonist, the prisoner's belief of innocence, the protagonist lying to the police, and the prisoner's appearance at the protagonist's home" to be scenes a faire); see also Denkers v. Uhry, 820 F. Supp. 722, 732 (S.D.N.Y. 1992) (concluding that "such generalized plot devices" as "accidents" cannot prove substantial similarity).

\* \* \* \*

In conclusion, because "no reasonable trier of fact could find the works substantially similar" for purposes of copyright law, Defendants are entitled to summary judgment on Plaintiff's

47

copyright claim.  <u>Walker</u>, 784 F.2d at 4.

**CONCLUSION**

For the reasons set forth above, The Court respectfully recommends that Plaintiff's motion for default judgment be denied, that Defendants' motion be granted, and that each of Plaintiff's claims therefore be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6(a) and (d).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Daniels.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>See</u> <u>Mario v. P & C Food Mkts., Inc.</u>, 313 F.3d 758, 766 (2d Cir. 2002); <u>Spence v. Superintendent</u>, 219 F.3d 162, 174 (2d Cir. 2000); <u>Small v. Sec'y of Health and Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: April 7, 2009
       New York, New York

Copies Sent to:

Eric L. Myrieckes
11013-068
United States Penitentiary, Atlanta
P.O. Box 150160
Atlanta, GA 30315

John Pelosi, Esq.
Pelosi Wolf Effron & Spates LLP
233 Broadway, 22nd Floor
New York, New York 10279

Curtis Smith
9622 Discovery Rise
Converse, TX 78109